**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 6 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

WILLIAM BROWN, JUDY BROWN,

      Plaintiffs,

v.

FRED C. VANARSDALE,
UNDERWRITERS SURETY, INC.,
NATIONAL AMERICAN
INSURANCE CO.,

      Defendants-Appellees,

and

JEFF CURTZ,

      Defendant,

and

TOMMY OSBORN, JR.,

      Defendant-Appellant.

No. 96-5220
(D.C. No. 95-CV-272-K)
(N.D. Okla.)

ORDER AND JUDGMENT[*]

Before BRORBY, BARRETT, and MURPHY, Circuit Judges.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

In this diversity case, defendant Tommy Osborn appeals the district court's entry of summary judgment against him on his negligence claims against his co-defendants. Osborn's claims arise out of the following events. In July 1994, William Brown, a resident of Oklahoma, was arrested in Butler County, Kansas, on several charges related to his driving while intoxicated. Brown secured his release from jail on a $1,000 appearance bond that was posted by defendant Fred C. VanArsdale, a local bondsman. Defendant National American Insurance Company was the surety on the bond, and its local manager was defendant Underwriters Surety, Inc. After being released on bond, Brown returned to his home in Oklahoma.

Brown subsequently failed to make two court appearances. On November 28, 1994, the Kansas court entered an order forfeiting the appearance bond. Upon learning of the bond forfeiture, VanArsdale contacted defendant Jeff Curtz, a bounty hunter, and assigned him Brown's case. Curtz had a contract with Underwriters pursuant to which he agreed to accept assignments to "investigate, locate, apprehend, [and] secure the arrest and/or surrender [of] a fugitive . . . from

justice on whose behalf [Underwriters] has posted a bond and whose failure to appear in court resulted in [Underwriters'] bond being forfeited." Appellant's App. at 87.

On a Saturday in early January 1995, Curtz contacted Brown by telephone, told him of his failure to appear, and asked Brown what he intended to do. Brown, who said he was unaware that he had missed any scheduled appearances, said he would have to speak with his lawyer. The next Monday, Curtz turned up at Brown's auto shop looking for Brown. Brown was not there, but two of his customers were. Apparently, hostile words were exchanged between the two men and Curtz. Curtz left after one of the men pulled out a gun. Brown learned of Curtz's visit later that day and decided the situation was sufficiently serious that he had better look into the status of his Kansas case. He called the County Attorney in Butler County, Kansas, who told Brown he would have to come to Kansas to discuss the matter. The next day, January 11, Brown went to Kansas, met with the County Attorney, and signed an agreement for pre-trial diversion. Pursuant to the agreement, prosecution of the charges would be delayed for twelve months, at the conclusion of which the charges would be dropped, provided Brown complied with the terms and conditions of the agreement. The County Attorney filed the diversion agreement with the court on January 11 and the court immediately entered an order vacating the bond forfeiture order. No one

notified VanArsdale, National, or Underwriters about either the diversion agreement or the vacation of the forfeiture order.

Two weeks later, Curtz, who was continuing his efforts to apprehend Brown, returned to Oklahoma. This time, unbeknownst to anyone, Curtz was accompanied by his friend Tommy Osborn, a carpet layer by trade. According to Brown, at about 11:20 on the night of January 23, he was awakened from his sleep on the living room couch by the sound of breaking glass. A lead pipe, about four feet long and four inches in diameter had been thrown through the sliding glass door. Two men, who later turned out to be Curtz and Osborn, came rushing through the broken door with their guns drawn, grabbed Brown, shoved him to the floor, and asked whether anyone else was in the house. Believing the men to be robbers, Brown did not respond. The men then handcuffed Brown's hands behind his back, dragged him from the house, and put him in their car.[1]

Brown finally figured out that his apprehension had something to do with the Kansas criminal charges when he heard Curtz and Osborn talking about taking him back to Kansas. Brown said he tried to explain to the two men that he had taken care of the Kansas charges, but they would not listen to him. After they

---

[1]     Osborn's version of events is rather different. He claims that he remained by the car the whole time and did not go into the house or participate in the actual seizure of Brown in any way. He does admit that he helped Curtz get Brown in the car and that he drove part of the way back to Kansas.

returned to Kansas, Curtz dropped Osborn off at his home and took Brown to the county jail, where Brown spent the rest of the night. After contacting the County Attorney the next morning, Brown was able to obtain his release from jail.

Criminal charges were filed against Curtz and Osborn in Oklahoma for first degree burglary and kidnaping. Osborn was bound over for trial on these charges in November 1996. Curtz, however, was killed not long after the charges were filed. Meanwhile, Brown and his wife filed suit in Oklahoma state court against Curtz, Osborn, VanArsdale, National and Underwriter's for trespass, assault and battery, and kidnaping. The civil case was removed to federal court and Osborn filed claims against his co-defendants for indemnification and negligence.[2] As to the latter, Osborn alleged that VanArsdale, National, and Underwriters (whom we will refer to collectively as the "surety defendants"), breached their duty "to inspect, verify, and confirm the warrant for Plaintiff William Brown's arrest," Appellant's App. at 110, 116, and not to misrepresent the status of their right to arrest Brown. Osborn also alleged that the surety defendants breached their duty to warn him that "he would be subjected to an extraordinary degree of risk of

---

[2]     Although Osborn's claims against his co-defendants were all the same, for some reason Osborn chose to file the claims against Curtz, VanArsdale, and National as cross-claims, and to file the claims against Underwriters in a separate third-party complaint.

injury to his person, to his reputation, and to his financial well-being" if he accompanied Curtz to Oklahoma to apprehend Brown. Id. at 108, 114.

The Browns subsequently reached a settlement with all the defendants. Because the settlement was funded entirely by National and/or Underwriters, it effectively mooted Osborn's claims for indemnification. The surety defendants then moved for summary judgment on Osborn's negligence claims, arguing, under a variety of theories, that they owed Osborn no duty. The district court addressed several of defendants' theories and concluded that, under Oklahoma law, the surety defendants did not owe a duty to Osborn to advise him of the status of their right to arrest Brown or to warn him of the risks involved in accompanying Curtz to apprehend Brown.

We review the grant or denial of summary judgment de novo, applying the same standard as the district court under Fed. R. Civ. P. 56(c). See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Based upon our review, we conclude that the risk of injury to Osborn was not foreseeable to the surety defendants and, therefore, that they owed him no duty.

The elements of a negligence claim have been described by the Oklahoma Supreme Court as follows: "(1) the existence of a duty on defendant's part to protect plaintiff from injury; (2) violation of that duty; and (3) injury resulting therefrom." Grover v. Superior Welding, Inc., 893 P.2d 500, 502 (Okla. 1995).

-6-

Thus, "[t]he threshold question in any suit based on negligence is whether the defendant had a duty to the particular plaintiff alleged to have been harmed." Id.

> [T]he existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking. Whether a defendant stands in such relationship to a plaintiff that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff is a question for the court.

Wofford v. Eastern State Hosp., 795 P.2d 516, 519 (Okla. 1990) (citation omitted). "The most important consideration in establishing duty is foreseeability." Delbrel v. Doenges Bros. Ford, Inc., 913 P.2d 1318, 1321 (Okla. 1996). "As a general rule a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks which make the conduct unreasonably dangerous." Wofford, 795 P.2d at 519 (quotation omitted).

Osborn argues that it was foreseeable to the surety defendants that Curtz would take someone with him to apprehend Brown, "since it is reasonable and in fact obviously necessary for a bounty hunter to be accompanied by another person, for such obvious safety reasons, etc. . . . because of the nature of the job that the bounty hunters were employed to perform." Principal Br. of Appellant at 12. Therefore, Osborn contends, the surety defendants had a duty to warn him that they had no right to arrest Brown and that assisting Curtz in the arrest could cause Osborn injury to his safety, reputation, and well-being.

Osborn, however, presented no evidence to establish that it was customary for bounty hunters in general, or Curtz in particular, to enlist the assistance of others in apprehending a fugitive. The evidence is undisputed that the surety defendants had no actual knowledge that Curtz had taken someone with him to apprehend Brown until the deed was complete. The first time VanArsdale learned that Curtz was not acting alone was when Curtz called VanArsdale on his way to the county jail with Brown and mentioned having stopped to drop off a friend. Nor does the evidence support an inference that the surety defendants should have known that Curtz would seek assistance in apprehending Brown. VanArsdale testified that Curtz had apprehended fugitives for Underwriters on several other occasions and that, to VanArsdale's knowledge, Curtz had never before taken someone with him to apprehend a fugitive. We also note that Curtz's contract with Underwriter's prohibited him from assigning any of his obligations or duties thereunder to someone else without Underwriter's prior written consent.

Therefore, even if we assume that the surety defendants had no right to arrest Brown and that they should have known this fact, the surety defendants owed no duty to Osborn to warn him that they had no right to arrest Brown or that Osborn might suffer injury if he assisted Curtz in apprehending Brown. Because the lack of foreseeability is dispositive of Osborn's claims, we need not address defendants' alternative theories for avoiding liability.

The judgment of the United States District Court for the Northern District of Oklahoma is AFFIRMED. Appellees' Motion to Strike is denied as moot.


Entered for the Court


Michael R. Murphy
Circuit Judge